# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# NEWNAN DIVISION

| | |
|---|---|
| WENCOR GROUP, LLC, | |
| *Plaintiff*, | Civil Action No. |
| v. | 3:24-cv-00011-TCB |
| KENNETH HUNTER MITCHEM, | |
| *Defendant*. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS

Richard L. Robbins      608030
Jeremy U. Littlefield      141539
Edward A. Bedard      926148
ROBBINS ALLOY BELINFANTE
  LITTLEFIELD LLC
500 14th Street, NW
Atlanta, Georgia 30318
T: 678-701-9320
E: rrobbins@robbinsfirm.com
   jlittlefield@robbinsfirm.com
   ebedard@robbinsfirm.com

*Counsel for Defendant*
*Kenneth Hunter Mitchem*

# TABLE OF CONTENTS

Introduction ................................................................................................ 1

Background ................................................................................................ 3

   I.   The Employment Agreement. ....................................................... 3

   II.  Mitchem resigns from Wencor and joins VSE ............................... 5

   III. Wencor files this lawsuit. ............................................................ 6

Legal Standard ........................................................................................... 7

Argument .................................................................................................... 7

   I.   The non-compete is unenforceable ............................................... 7

       A.   The noncompete fails to give "fair notice" of its "maximum reasonable scope" of prohibited activities. ............................ 9

       B.   The noncompete is unenforceable because it is overbroad .................... 12

   II.  Wencor's nondisclosure claim fails. ........................................... 14

       A.   The nondisclosure provision is unenforceable. ...................... 14

       B.   Wencor fails to allege how Mitchem breached his nondisclosure obligations. ................................................. 16

   III. Wencor's claim for contractual attorneys' fees must be dismissed. ........... 17

       A.   One-sided, unlimited attorneys' fees provisions in the restrictive-covenant context violate Georgia's public policy. ............... 17

       B.   One-sided, unlimited attorneys' fees provisions are substantively and procedurally unconscionable .................... 21

   IV. Wencor's fiduciary-duty claim is as an improper shotgun pleading ........... 24

Conclusion ................................................................................................ 25

## INTRODUCTION

This case arises out of Plaintiff Wencor Group LLC's attempts to enforce its form employment agreement containing overbroad, unreasonable, and unenforceable restrictive covenants on one of its former employees. Because the restrictive covenants are plainly and facially unenforceable under Georgia law, the Complaint must be dismissed.

*First*, Wencor's claim for breach of the Employment Agreement's noncompete fails because it does not include any time limitation in defining the products and services against which Mitchem is not allowed to compete. Is Mitchem prohibited from competing against any product or service Wencor has offered at any time in its existence? Just during the time Mitchem was employed? Into the future? If Wencor acquired a new business line tomorrow, would Mitchem be prohibited from competing against that? The noncompete's failure to provide answers to these questions means that it fails to give "fair notice" of the "maximum reasonable scope" of the activities which it purports to prohibit, as required by Georgia law, and is thus unenforceable. O.C.G.A. § 13-8-53(c).

Moreover, the descriptions the noncompete does contain are overbroad. For example, its definition of prohibited competitive activity includes "licensing, rental, [and] lease" of "any product or service competitive with any of the products or services offered by the Company." Compl., Ex. 1 § 9.1. And its geographic

scope prohibits Mitchem from doing such actions not only in the places Wencor actually does business, but also where Wencor "intends" to do business. Under these definitions, Mitchem would not only be prohibited from working for a competitor—he'd be prohibited from working for a *customer* of a competitor. Such prohibitions are far too broad to be enforceable.

*Second*, the Employment Agreement's nondisclosure provision is likewise unenforceable. The nondisclosure provision fails to include a time limitation, which is per se unreasonable and unenforceable under longstanding Georgia law. It is also written in such broad terms that it would preclude Mitchem from disclosing the fact that Wencor uses Microsoft Word. There is no legitimate business purpose served by such overbroad prohibitions. But even if the nondisclosure provision was enforceable, Wencor's claim also fails because it never alleges *what* Mitchem supposedly disclosed beyond conclusory allegations founded on pure speculation and fear.

*Third*, Wencor's claim for contractual attorneys' fees fails. The Employment Agreement's attorneys' fees provision is both one-sided and unlimited: only Wencor has the possibility of recovering its attorneys' fees, and it can purportedly do so for "all" of its fees, regardless of whether such fees are necessary or reasonable. The one-sided leverage that self-serving provisions like this place in the hands of well-resourced employers like Wencor upsets the delicate balance

Georgia law has struck between the interests of employers and employees, taking otherwise unenforceable restrictive covenants and making them *de facto* enforceable. As such, it violates Georgia's public policy against unreasonable restrictive covenants and is substantively unconscionable. In addition, the attorneys' fees provision is also buried in the fine print and divorced from the rest of the restrictive covenant provisions. Thus, it is also procedurally unconscionable.

*Fourth*, Plaintiff's claim for breach of fiduciary duty is an improper shotgun pleading in that it merely reincorporates all of the allegations before it and fails to identify the factual allegations supporting its claim.

For these reasons, Mitchem respectfully requests that the Court dismiss Wencor's Complaint pursuant to Rules 8(a)(2), 10(b), and 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

### I.    The Employment Agreement.

On April 2, 2021, Wencor extended an offer of employment to Mitchem. Compl. ¶¶ 15–16; Dkt. 2-1, Ex. 2.[1] Mitchem accepted Wencor's offer on April 3, 2021. Dkt. 2-1, Ex. 2. Thereafter, Wencor presented Mitchem with a form

---

[1] Consideration of the offer letter is appropriate on a motion to dismiss. Wencor references the offer letter in its Complaint and attaches it to its separately filed motion for temporary restraining order. Compl. ¶¶ 15–16; Dkt. 2-1; *see also, e.g.*, *St. George v. Pinellas Cty.*, 285 F.3d 1334, 1337 (11th Cir. 2002).

employment agreement (the "Employment Agreement"). Compl., Ex. 1. In

exchange for continued employment, the Employment Agreement purports to

impose noncompete and nondisclosure covenants on Mitchem:



*Id.* §§ 2, 9. Also, buried in the middle of a separate section titled "Other Terms,"

the last sentence of a 225-word, single-spaced paragraph contains a one-sided,

unlimited attorneys' fees provision:

11. **Other Terms**

11.1   I agree that the terms of this Agreement shall survive the termination of my employment.

11.2   I hereby authorize the Company to notify others, including but not limited to customers of the Company or my future employers of the terms of this Agreement and my responsibilities hereunder.

11.3   I agree that this Agreement shall inure to the benefit of the Company's successors in interest, including, but without limitation to, successors through merger consolidation, or sale of substantially all of the Company's stock or assets, and shall be binding upon me.

11.4   I agree that if any court or tribunal shall refuse to enforce the restrictive covenants in Articles 2, 9, and/or 10 of this Agreement because the particular time limits or scope of the restrictions are deemed unreasonable or unenforceable, that neither this Agreement nor any part thereof, shall be void, and that the particular restriction deemed to be unreasonable or unenforceable shall be reduced or otherwise modified by such court or tribunal, but only to the extent necessary to permit its enforcement and only in such court's jurisdiction. If any provision cannot be reduced or modified to make it reasonable and/or permit its enforcement, that provision shall then be severed from this Agreement and the remaining provisions shall be interpreted in such a way as to give maximum validity and enforceability to this Agreement. I agree that if any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of this Agreement that can be given effect without the invalid provisions or applications, and to this end the provisions of this Agreement are declared to be severable.

11.5   I agree that irreparable harm shall be presumed if Articles 2, 9, and/or 10 of this Agreement are breached in anyway, that in the event of such a breach damages would be difficult if not impossible to ascertain, and that the faithful observance of all terms of this Agreement is an essential condition to employment with the Company. Furthermore, I acknowledge that this Agreement is intended to protect the proprietary rights of the Company in important ways, and prevent the threat of any misuse of the Proprietary Information of the Company, which would be extremely harmful because of the importance of that information. In light of these considerations, I agree that any court of competent jurisdiction may immediately enjoin any breach of Articles 2, 9 and/or 10 of this Agreement, upon the request of the Company, and I specifically release the Company from the requirement of posting any bond in connection with temporary or interlocutory injunctive relief, to the extent permitted by law. Nothing in this Agreement shall be construed as prohibiting the Company from pursuing any other remedy or remedies including, but without limitation to, recovery of damages, including loss of good will. If I am found to be in breach or default of obligations under this Agreement, I agree to pay all costs, expenses, and attorney's fees incurred by the Company.

*Id.* § 11.5. On April 14, 2021, Mitchem signed the Employment Agreement. *Id.*.

## II.   Mitchem resigns from Wencor and joins VSE.

During his two-year employment with Wencor, Mitchem helped grow Wencor's Distribution segment. The company experienced record growth during his tenure and was successful enough that it was eventually purchased by HEICO Corp. in mid-2023. *Id.* ¶¶ 21, 26. During that time, however, Mitchem's wife and two young children continued to live in Kansas while Mitchem commuted to Wencor's Georgia headquarters every week, often Sunday through Friday. Despite his and Wencor's professional success, Mitchem was unhappy with Wencor's culture, unsure of his career path in a post-acquisition company and lack of alignment on compensation-structure possibilities, and most importantly, tired of missing his children grow up. Accordingly, Mitchem began looking to exit Wencor

and focus on various business projects he and his wife were eager to start, including health-and-wellness and real-estate companies they founded together. And on September 14, 2023, Mitchem submitted his resignation, which became effective October 20, 2023. *Id.* ¶¶ 86–87.

While these new projects were his long-term focus, Mitchem also knew that he would need to continue working while they got off the ground, as his income represented the vast majority of his family's income. Continuing to work would also allow his wife to leave her job, a promise Mitchem made after she had spent two years of essentially being a single mother while Mitchem commuted. Thus, Mitchem was also exploring other potential opportunities in the interim. After considering various options, Mitchem eventually accepted an offer to return to VSE, his previous employer. *Id.* ¶¶ 1, 94, 99.

## III. Wencor files this lawsuit.

On January 4, 2024, Wencor sent a letter to VSE and Mitchem claiming that he was in violation of the restrictive covenants contained in the Employment Agreement. *Id.* ¶¶ 117, 119. On January 23, 2024, Wencor filed this lawsuit. Wencor effectively asserts three separate claims in its Complaint: (1) breach of the Employment Agreement's noncompete, (2) breach of the Employment Agreement's nondisclosure provision, and (3) breach of fiduciary duty. Compl. ¶¶ 126–41. Wencor also seeks contractual attorneys' fees pursuant to the

Employment Agreement's attorneys' fees provision. *Id.* ¶ 135.[2]

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Georgia Elec. Life Safety & Sys. Ass'n, Inc. v. City of Sandy Springs*, 965 F.3d 1270, 1274 (11th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Establishing plausibility requires more than a sheer possibility that a defendant has acted unlawfully." *Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cty. Bd. of Registration & Elections*, 36 F.4th 1100, 1113 (11th Cir. 2022) (internal quotation marks omitted). While the Court must accept all well-pleaded allegations as true, a complaint offering mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court must disregard conclusory allegations and "naked assertion[s]" devoid of "further factual enhancement" when deciding a motion to dismiss. *Id.* at 565.

## ARGUMENT

### I.   The non-compete is unenforceable.

Wencor's first breach-of-contract theory—that Mitchem violated his

---

[2] Wencor also filed a motion for temporary restraining order contemporaneously with its Complaint. Mitchem's response to that motion is due on March 15, 2024, and a hearing is scheduled for March 27, 2024.

noncompete—fails because the noncompete provision is unenforceable as a matter of law. Georgia law has long distinguished between "unreasonable" and "reasonable" restrictive covenants: the former are void as against public policy, while the latter are valid and enforceable. *Motorsports of Conyers, LLC v. Burbach*, 317 Ga. 206, 211–16 (2023). The "reasonableness" of a restrictive covenant is an issue of law for the court to decide and is determined by considerations of public policy, not the parties' contractual rights. *Hood v. Legg*, 160 Ga. 620 (1925); *see also Burbach*, 317 Ga. at 212–13.

Over the decades, courts set forth various factors and tests as they "grappled with how to distinguish reasonable restrictive covenants from unenforceable contracts in general restraint of trade." *Id.* at 213. And in 2011, the Georgia legislature stepped in and added to that body of law by passing the Georgia Restrictive Covenants Act ("GRCA"). O.C.G.A. § 13-8-50, *et seq.* The GRCA modifies preexisting law by adding specific requirements, providing certain presumptions, and giving some additional guidance to courts about the standards governing the enforceability of restrictive covenants. But the GRCA did not change Georgia's preexisting framework that unreasonable restrictive covenants are not enforceable. O.C.G.A. § 13-8-53(d); *Burbach*, 317 Ga. at 207.

Under Georgia law as modified by the GRCA, contract provisions that "restrict competition" like the noncompete at issue in this case must be "justified

by a legitimate business interest" and "reasonably restricted in [1] time, [2] geographic area, and [3] scope of prohibited activities" in order to be enforceable. *Id.* § 53(a). In addition, the provision must be "sufficiently specific" in its description to give the employee "fair notice" of its scope. *Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1306 (11th Cir. 2023).

Here, the noncompete fails to satisfy these strict requirements on multiple grounds. *First*, the noncompete fails to give "fair notice" of its "maximum reasonable scope" because it fails to include any pre-termination time limitations in defining prohibited conduct. *Second*, the noncompete is overbroad in its scope in that it defines prohibited activity in such a broad way as to be divorced from any legitimate business interests. *Third*, the noncompete is geographically overbroad in that prohibits Mitchem from acting anywhere in the world in which Wencor not only did business, but also "attempt[ed] … or intend[ed] to do business."

## A. The noncompete fails to give "fair notice" of its "maximum reasonable scope" of prohibited activities.

Georgia law not only requires that a restrictive covenant be reasonable in time, geographic area, and scope of prohibited activities, but it also requires that the descriptions of such categories "provide[ ] fair notice of the *maximum reasonable scope* of the restraint." O.C.G.A. § 13-8-53(a) (emphasis added); *see Baldwin*, 87 F.4th at 1306 (reasonableness and fair notice are two separate concepts under Georgia law). Inherent in this notice requirement is the need to

place some temporal limitation on the description of the scope of prohibited

activity or geographic restraint. The GRCA, for example, provides two examples

of language that would satisfy the notice requirement:

> (c)(1) In case of a post-employment covenant entered into prior to termination, any good faith estimate of the activities, products, or services, or geographic areas, that may be applicable *at the time of termination* shall also satisfy such requirement … [and will be] construed ultimately to cover only so much of such estimate as relates to the activities actually conducted, the products or services actually offered, or the geographic areas actually involved *within a reasonable period of time prior to termination*.

> (2) Activities, products, or services shall be considered sufficiently described if a reference to the activities, products, or services is provided and qualified by the phrase "of the type conducted, authorized, offered, or provided *within two years prior to termination" or similar language containing the same or a lesser time period*. The phrase "the territory where the employee is working *at the time of termination*" or similar language shall be considered sufficient as a description of geographic areas if the person or entity bound by the restraint can reasonably determine the maximum reasonable scope of the restraint at the time of termination.

O.C.G.A. § 13-8-53(c)(1)–(2) (emphasis added). As the emphasized language

demonstrates, the GRCA presumes that a temporal limitation is necessary to give

an employee fair notice of the scope of prohibited activities.

Here, the noncompete purports to prohibit Mitchem from competing

"against any of the products or services offered by the Company." Compl., Ex. 1

§ 9.1. But the noncompete does not specify *when* those "products or services" are

offered by Wencor. Does the description include all products/services offered by the Company for the past twenty years? During Mitchem's employment? Only at the time he was terminated? In the future? If Wencor decided tomorrow to acquire an automotive parts business that competed with VSE's Wheeler Fleet division—an entity which does not currently compete with Wencor—would Mitchem thus be precluded from working for Wheeler Fleet? Under a plain reading of the noncompete, he might. But it's not clear. And that's the substantive problem with this provision. Because these questions cannot be answered by looking to the noncompete itself, it fails to provide Mitchem with fair notice of the "maximum reasonable scope" of prohibited activities. As such, it is unenforceable.

Notably, other portions of the noncompete *do* include time limitations. For example, the geographic description—which must also provide fair notice—states that Mitchem is prohibited from competing in any areas in which Wencor "does business, attempts to do business, or intends to do business *at any time during [his] employment with the Company*." *Id.* (emphasis added).[3] Wencor therefore knew full well how to put in a time limitation; it simply chose not to when it came to describing the scope of prohibited activities.[4]

---

[3] This geographic description suffers from other problems discussed further below.
[4] If anything, the fact that Wencor did use a temporal limitation with respect to the geographic description but chose not to elsewhere in the same section suggests that Wencor intended there to be no temporal limitation on the description of prohibited activities.

– 11 –

Having chosen to omit the required temporal limitation altogether, Wencor cannot now ask the Court to supply one. The Court's ability to modify an otherwise unenforceable restrictive covenant begins and ends with striking offensive language—it cannot supply "new and material terms from whole cloth." *LifeBrite Lab'ys, LLC v. Cooksey*, No. 1:15-CV-4309-TWT, 2016 WL 7840217, at *7 (N.D. Ga. Dec. 9, 2016). Accordingly, because the noncompete fails to give fair notice of the maximum reasonable scope of prohibited activities, it fails to comply with the GRCA and is unenforceable.

**B.  The noncompete is unenforceable because it is overbroad.**

In addition to its lack of fair notice, the noncompete is unreasonable because its description of prohibited activities and its geographic scope are overbroad. The noncompete purports to prohibit Mitchem from "assist[ing]" anyone from "competing against any of the products or services offered by the Company." Compl., Ex. 1 § 9.1. It further defines this prohibited activity as "includ[ing], but not limited to" a whole host of activities, including the "licensing, rental, [and] lease" of "any product or service competitive with any of the products or services offered by the Company." *Id.* Under this provision, Mitchem would be prohibited not only from working for a direct competitor, but also working for a *customer* of a competitor. Moreover, the noncompete purports to not only prohibit Mitchem from competing in places worldwide where Wencor *actually* did business during his

employment, but also places where it "attempt[ed] to do business, or intend[ed] to do business." *Id.* Not only does this fail to give Mitchem fair notice of the provision's "maximum reasonable [geographic] scope" of the noncompete's prohibits, but it is also substantively unreasonable. O.C.G.A. § 13-8-53(c)(2) (requiring geographic descriptions to allow the employee to "reasonably determine [their] maximum reasonable scope"). Lastly, the covenant is also overbroad in that it effectively operates in perpetuity. Despite including a two-year time limitation, it also includes a provision which purports to toll that limitation during any alleged breach of the agreement. Compl., Ex. 1 § 11.12. Georgia courts have long held that such clauses nullify any time limitations and effectively turn restrictive covenants into unenforceable restrictions which operate with no time limit. *E.g.*, *Fortress Inv. Grp., LLC v. Holsinger*, 354 Ga. App. 405, 410 (2020); *Siech v. Hobbs Grp., LLC*, No. 1:04-CV-3199-CC, 2005 WL 8155045, at *8 (N.D. Ga. Nov. 8, 2005), *aff'd*, 198 F. App'x 840 (11th Cir. 2006).

While the GRCA may allow the court to blue pencil some of these issues specifically, that power is within the court's discretion. *Belt Power, LLC v. Reed*, 354 Ga. App. 289, 295 (2020). Given the tremendous overbreadth, lack of clarity, and unfairness inherent in the Employment Agreement, the Court should decline to exercise any such authority here. *Mercer Glob. Advisors Inc. v. Crowley*, No. 1:21-CV-03932-JPB, 2023 WL 2531727, at *5 n.6 (N.D. Ga. Mar. 15, 2023) (declining

to blue-pencil because of "overly broad definition").

## II.   Wencor's nondisclosure claim fails.

### A.   The nondisclosure provision is unenforceable.

In addition to its claim for breach of the noncompete, Wencor's claim for breach of the nondisclosure provision fails because it is unenforceable. A nondisclosure clause, like any other restrictive covenant, "depends upon its reasonableness." *Holland Ins. Grp., LLC v. Senior Life Ins. Co.*, 329 Ga. App. 834, 838 (2014) (quotations omitted). The reasonableness of a non-disclosure agreement "hinges on two factors: (1) whether the employer is attempting to protect confidential information relating to the business … and (2) whether the restraint is reasonably related to the protection of the information." *Id.* (quotations omitted). Georgia courts have long held that this means non-disclosure clauses must be limited in time, and any "nondisclosure clause with no time limit is unenforceable as to information that is not a trade secret." *Allen v. Hub Cap Heaven, Inc.*, 225 Ga. App. 533, 539(6) (1997).[5] In addition, nondisclosure clauses

---

[5] This requirement was unaffected by the GRCA. The GRCA did not supplant existing Georgia law *in toto*; it merely altered it in certain important respects by adding or altering certain requirements and presumptions. *See Burbach*, 317 Ga. at 215 (applying pre-GRCA caselaw and noting that the GRCA "preserved the settled understanding" except where it altered it). Moreover, since the Act is "in derogation of the common law," it "must be limited strictly to the meaning of the language employed, and not extended beyond the plain and explicit terms of the statute." *Belt Power*, 354 Ga. App. at 292. The GRCA states merely that "nothing *in this article*"—*i.e.*, the GRCA—"shall be construed to limit the time of time" a

must be reasonable in scope. *Crowley*, 2023 WL 2531727, at *5 (holding non-disclosure claim to be unenforceable because it "seem[ed] to include every piece of paper that Plaintiff has ever generated.").

Here, the nondisclosure provision fails on both counts. *First*, the nondisclosure provision lacks any time limitation whatsoever. Quite the opposite—it purports to obligate Mitchem in perpetuity. Compl., Ex. 1 § 2.3 ("I acknowledge that my obligations under Article 2 of this Agreement shall be *continual*[.]"). Thus, unless the information qualifies as a trade secret under Georgia law, the nondisclosure provision is unenforceable.

*Second*, the nondisclosure provision is wildly overbroad. The nondisclosure provision purports to prohibit Mitchem from disclosing any "Propriety Information," the definition of which covers "all information relating to" a wide swath of categories of information, regardless of whether that "information" is itself confidential or whether the categories of information it "relates to" are truly proprietary. *Id.* § 2.1. It reads as if someone went word-by-word through a thesaurus, copying down every entry that might be used in a business setting. To take it as its written, the nondisclosure provision would preclude Mitchem from

---

person may agree to abide by a nondisclosure agreement. O.C.G.A. § 13-8-53(e) (emphasis added). In other words, the GRCA did not impose a new time limit on nondisclosure agreements. But nor did it eliminate the requirement that they contain at least *some* temporal limitation.

disclosing the fact that Wencor uses Microsoft Word. That sort of restriction is clearly divorced from any legitimate business interest. Because Wencor "essentially seeks to ban disclosure of any and all information related to [its] business," like the provision in *Crowley*, the nondisclosure provision here is "overbroad and unenforceable." 2023 WL 2531727 at *5.[6]

### B. Wencor fails to allege how Mitchem breached his nondisclosure obligations.

Notwithstanding the unenforceability of the nondisclosure provision, Wencor's nondisclosure claim also fails because it has not sufficiently alleged that Mitchem actually disclosed any "Proprietary Information." The Complaint makes only the conclusory allegation "upon information and belief" that he violated his nondisclosure obligations by "disclosing Proprietary Information … including in relation to his unauthorized sales of the [Actuation] Parts." Compl. ¶ 130. But Wencor fails to say *what* information he disclosed or *how* he disclosed it. And the mere sale of the Actuation Parts does not disclose "information," let alone information that is proprietary or confidential. Without something more, the conclusory allegations contained in Wencor's complaint are simply insufficient and its nondisclosure claim must be dismissed. *See, e.g.*, *FT Glob. Cap., Inc. v.*

---

[6] Given the overbreadth of the nondisclosure provision and its complete lack of a time limitation, the Court should decline to blue-pencil the provision. 2023 WL 2531727 at *5 n.6 ("Given how overly broad this definition is, the Court is not willing to blue-pencil the provision to make it enforceable.").

*Future Fintech Grp.*, Inc., No. 1:21-CV-00594-JPB, 2021 WL 5232483, at *4

(N.D. Ga. Nov. 10, 2021) (dismissing claim for breach of non-disclosure provision

where plaintiff did not "identify what kind of confidential or proprietary

information Defendant disclosed[.]"); *Johnson Matthey Process Technologies',*

*Inc. v. Hovey*, No. CV420-322, 2021 WL 5513988, at *6 (S.D. Ga. July 8, 2021)

(dismissing misappropriation claim where plaintiff had not "alleged how or when

Defendant … disclosed or used … its confidential information.").

## III. Wencor's claim for contractual attorneys' fees must be dismissed.

### A. One-sided, unlimited attorneys' fees provisions in the restrictive-covenant context violate Georgia's public policy.

The Court must also dismiss Wencor's claim for contractual attorneys' fees

as the Employment Agreement's one-sided, unlimited attorneys' fees provision

violates public policy. Under Georgia law, a "contract that is against the policy of

the law cannot be enforced." O.C.G.A. § 13-8-2(a). Among these are "contracts in

general restraint of trade, as distinguished from contracts which restrict certain

competitive activities, as provided in [the GRCA.]" *Id.* The difference between

these two rests in their respective reasonableness: "unreasonable restrictive

covenants are contracts in general restraint of trade that are against public policy,

while reasonable restrictive covenants are valid and enforceable." *Burbach*, 317

Ga. at 212. The "reasonableness" of a contract is determined by the looking to

"whether the contract unduly burdens the public interest, and thus … public policy

is the test." *Hood*, 160 Ga. at 620.

Restrictive covenants in contracts implicate two important and long-standing public policies which stand in tension. On the one hand, "[p]ublic policy requires that every man shall be at liberty to work for himself; and shall not be at liberty to deprive himself or the state of his labor, skill, or talent by any contract that he enters into." *Id.* On the other hand, Georgia has an interest in protecting "legitimate business interests" and "creating an environment that is favorable to attracting" business to the state. O.C.G.A. § 13-8-50. Despite their inherent tension, Georgia has managed to strike a delicate balance between these two principles through centuries of decisional case law and legislative enactment through the GRCA.

Unilateral attorneys' fees provisions like the one at issue in this case throw this delicate balance out of whack. They place all of the risk—and none of the upside—for litigating the enforceability and reasonableness of a restrictive covenant onto the employee. When faced with the threat of litigation from a former employer and the prospect of having to pay their (likely expensive) corporate litigation counsel's attorneys' fees, it would come as little surprise if many employees simply folded. And for those who do decide to take their chances (or have no choice in the matter), the constant, overhanging threat of paying both sides' fees will inevitably affect the intensity with which they litigate their case.

To see the effect such provisions have, imagine a restrictive covenant which

purported to prohibit an employee from competing with the employer for 10 years after employment, a term that is clearly unreasonable and unenforceable under Georgia law. Under normal circumstances, the employee probably feels pretty good about his chances, regardless of whether the contract would be governed by the American Rule or by a reciprocal fee-shifting clause. But introduce a one-sided attorneys' fees provision like the one at issue here and the calculus changes dramatically. The employer is now fully incentivized to go after the employee, despite knowing that the covenant is likely unenforceable; at worst, they pay their own attorneys' fees. The employee, however, faces tremendous downside risk. Despite feeling like he has a fairly strong chance at winning, there's always the chance that the court blue pencils the time limitation and enforces a shorter covenant period, in which case the employee might still be on the hook for the employer's attorneys' fees in addition to his own. Nor does the employee have any countervailing upside. If he wins and demonstrates that the provision is unenforceable, then he still bears the burden of his own attorneys' fees. That kind of risk would almost certainly make any employee think twice before defending himself. And that's in a fairly clear case; the risk imbalance becomes all the more disparate in cases that are more gray than black-and-white.

To make matters worse, the clause at issue here does not even limit itself to "reasonable" attorneys' fees; it seeks to impose "*all* costs, expenses, and attorneys'

– 19 –

fees incurred by" Wencor on to Mitchem. Compl., Ex. 1 § 11.5 (emphasis added).
A provision like this removes all incentive for restraint. Indeed, it does the
opposite: it creates an incentive for an employer like Wencor to simply drive up
attorneys' fees as a litigation tactic. Either the risk of ever climbing attorneys' fees
either forces the employee to eventually capitulate or the employer has the chance
of increasing the punitive penalty imposed on a competitor and its new employee.
When considering the gross differences in resources between corporate employers
and individual employees, paying for a few more billable hours is a small price for
the employer to pay for that kind of leverage.

　　This gross imbalance of power is not justified by any countervailing public
policy. One-sided, unlimited attorneys' fees provisions in this context don't level
the playing field. They don't encourage careful drafting. They don't incentivize
efficient litigation on the merits. They don't deter frivolous claims. And they don't
help to strike a balance between free enterprise and the protection of legitimate
business interests. In short, one-sided, unlimited attorneys' fees don't serve any
public policy interest whatsoever, particularly in the restrictive covenant context.
*In re Checking Acct. Overdraft Litig. MDL No. 2036*, 685 F.3d 1269, 1282 n.16
(11th Cir. 2012) (discussing "the interest in financing particular types of disputes"
and "deterring frivolous claims" as two possible justifications for one-sided
attorneys' fees provisions); Jeffrey C. Bright, *Unilateral Attorney's Fees Clauses:*

*A Proposal to Shift to the Golden Rule*, 61 Drake L. Rev. 85, 109 (2012) (demonstrating why one-sided fees clauses do not serve any of the various public-policy justifications for fee shifting).

In fact, they *undermine* public policy. One-sided attorneys' fees serve merely as a cudgel for well-resourced employers to force individual employees into capitulating, regardless of the merits. This inevitably leads to the *de facto* enforcement of unreasonable restrictive covenants—indeed, it's the very reason the clause exists in the first place. Accordingly, one-sided, unlimited fee-shifting clauses like the one at issue in this case violate Georgia's clear public policy against the unreasonable restraint of trade and are void. Wencor's claim for contractual attorneys' fees should therefore be dismissed.

### B. One-sided, unlimited attorneys' fees provisions are substantively and procedurally unconscionable.

For many of these same reasons, the attorneys' fees provision is also substantively and procedurally unconscionable. Georgia courts "examine unconscionability from the perspective of substantive unconscionability, which looks to the contractual terms themselves, and procedural unconscionability, which considers the process of making the contract." *Innovative Images, LLC v. Summerville*, 309 Ga. 675, 684–85 (2020) (quotations omitted).

**Substantively unconscionable.** "[A] contractual term "is substantively suspect if it reallocates the risks of the bargain in [an] objectively unreasonable or

unexpected manner[.]" *NEC Techs., Inc. v. Nelson*, 267 Ga. 390, 395 (1996). In analyzing substantive unconscionability, "courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Id.* at 392.

Similar to the discussion above, the "purpose and effect" of one-sided, unlimited attorneys' fees provisions in the restrictive covenant context is to turn all noncompetes—reasonable or unreasonable—into *de facto* enforceable covenants. Moreover, they disincentivize well-resourced employers like Wencor from carefully drafting and reviewing their stock employment agreements, knowing that the threat of litigation alone (or the possibility the court might blue-pencil the contract) will likely lead the employee to capitulate. Indeed, that's the whole point of putting such a provision in the agreement in the first place. There may even be times where the employee wants to settle but can't, because the company feels it has a decent case and no downside risk. And if the employee does bother to defend himself, the employer then has every incentive to run up the bill, because the fees provision purports to cover "*all* costs, expenses, and attorneys' fees incurred by the Company," regardless of whether they are reasonable or not. Compl., Ex. 1 § 11.5. Thus, the "purpose and effect" of such provisions is to undermine Georgia's longstanding policy of refusing to enforce unreasonable restrictive covenants, and

it puts employees in a heads-you-win, tails-I-lose scenario against far more well-resourced opponents. No sane employee with bargaining power would agree to such a provision. Accordingly, the fees provision in substantively unconscionable.

**Procedurally unconscionable.** Notwithstanding its substantive unconscionability, the fees provision is also procedurally unconscionable on its face. When determining procedural unconscionability, courts look to a variety of factors, including among others, "age, education, intelligence, business acumen and experience of parties, their relative bargaining power, the conspicuousness of and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of meaningful choice." *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1265 (11th Cir. 2017) (quotations omitted).

Taking the allegations in the Complaint and the contract language at issue here, these factors weigh against the enforceability of the fees provision here. Georgia courts have already recognized that employees enter into employment agreements "at a great bargaining disadvantage." *Rash v. Toccoa Clinic Med. Assocs.*, 253 Ga. 322, 325, (1984). Wencor made an offer of employment to Mitchem that contained no mention of any restrictive-covenant condition on his employment. Dkt. 2-1, Ex. 2. Only after he signed the offer did Wencor provide him with the Employment Agreement that purported to condition his continued employment on the acceptance of the restrictive covenants. *Id.*; Compl., Ex. 1. The

Employment Agreement is a form contract drafted by Wencor that was not specifically negotiated between the parties. *Id.* (last revised in May 2019) As already discussed above, the effect of the fee shifting dramatically increases Wencor's power and leverage relative to the signing employee. Given the tremendous consequences of such a provision, one might expect it to be highlighted, as several other important terms were in the introductory page to the Employment Agreement. *Id.* But instead, it's buried deep within a large block of text in an otherwise inconspicuous section titled "Other Terms." *Id.* Under these circumstances, the attorneys' fees provision is procedurally unconscionable.

## IV.   Wencor's fiduciary-duty claim is as an improper shotgun pleading.

Wencor's second claim for breach of Mitchem's fiduciary duty to Wencor must be dismissed as an impermissible shotgun pleading because Wencor "commits the mortal sin of re-alleging all preceding counts" and factual allegations without specifying those which it contends support that claim specifically. *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1322 (11th Cir. 2015). Wencor's fiduciary-duty claim begins by "incorporat[ing] by reference the allegations in paragraphs 1 through 136 as if fully set forth herein." Compl. ¶ 137. In other words, Wencor realleges the entirety of the Complaint—including the entirety of its breach-of-contract claim—in its fiduciary-duty claim. Wencor then goes on to simply state the basic conclusory elements of a fiduciary-duty claim, namely that

Mitchem (1) had a fiduciary duty of loyalty, (2) he breached those duties, (3) and Wencor suffered damages as a result. *Id.* ¶¶ 138–140.

Even reading the Complaint generously, it is impossible for Mitchem to know *how* Wencor alleges he breached his fiduciary duties. Does Wencor allege he breached them by selling the Actuation Parts? *Id.* ¶¶ 60–83. By "solicit[ing] Wencor's Senior Director of Business Development" to join Mitchem in operating a non-competitive health-and-wellness franchise? *Id.* ¶¶ 84–85. By joining VSE after he left Wencor? *Id.* ¶¶ 86–99. By failing to follow up with Wencor to tell them personally that he was doing so? *Id.* ¶¶ 88–92. By allegedly breaching his noncompete? *Id.* ¶ 116, 126–36. Not coming into compliance before Wencor filed this lawsuit? *Id.* ¶¶ 117–25. All of the above? Some but not others?

It's unclear. And that's precisely the problem the Eleventh Circuit has identified with shotgun pleadings like Wencor's fiduciary-duty claim. By failing to specify which acts it believes violated Mitchem's fiduciary duty—*i.e.*, "the grounds upon which [the] claim rests"—Mitchem cannot properly frame a defense to the claim. Accordingly, the claim must be dismissed. *Weiland*, 732 F.3d at 1322.

## CONCLUSION

For the reasons stated above, Defendant Mitchem respectfully requests that the Court grant his motion and dismiss Plaintiff Wencor's claims with prejudice.

Respectfully submitted this 4th day of March, 2024.

*/s/ Edward A. Bedard*
Richard L. Robbins     608030
Jeremy U. Littlefield   141539
Edward A. Bedard     926148
ROBBINS ALLOY BELINFANTE
  LITTLEFIELD LLC
500 14th Street, NW
Atlanta, Georgia 30318
T: 678-701-9320
E: ebedard@robbinsfirm.com
   rrobbins@robbinsfirm.com
   jlittlefield@robbinsfirm.com

*Counsel for Defendant*
*Kenneth Hunter Mitchem*

## LOCAL RULE 7.1(D) CERTIFICATION

I certify that this Memorandum of Law in Support of Defendant's Motion to Dismiss has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1. Specifically, this document has been prepared using 14-pt Times New Roman font and type.

*/s/ Edward A. Bedard*
Edward A. Bedard